**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1258

OCCUPY COLUMBIA; WALID HAKIM; MELISSA HARMON; BRADLEY POWELL; TIMOTHY LISZEWSKI; DAVID BLAND; ASHLEY BLEWER; DAVID ARROYO; GADSON BENNETT; JOSHUA ANDERSON; SEBASTIAN PENA; JUSTINE WOODS; JOHANNA CAPLE; JOHN RUTLEDGE; L. SHAW MITCHELL,

    Plaintiffs – Appellees,

        v.

NIKKI HALEY, Governor of South Carolina; LEROY SMITH, Director of the South Carolina Public Safety; ZACHERY WISE, Chief of Police of the South Carolina Bureau of Protective Services; JAMES CARR; JOE HODGE; ANDREW SCHMIDT; MARVIN HARRIS, III,

    Defendants – Appellants,

        and

STATE OF SOUTH CAROLINA; HARVEY S. PEELER, JR., Chairman of the South Carolina State House Committee; M RICHBOURG ROBERSON, Divison of General Services; STERLING L. MORRISON, Division of General Services; CURTIS LOFTIS, State Treasurer; RICHARD ECKSTROM, Comptroller General; HUGH LEATHERMAN, Chairman Senate Finance Committee; BRIAN WHITE, Chairman House Ways and Means Committee; SOUTH CAROLINA BUDGET AND CONTROL BOARD; MARCIA ADAMS, Executive Director of the South Carolina Budget and Control Board; CARLA GRIFFIN, Division of General Services,

    Defendants,

MARIE THERESE ASSA'AD-FALTAS,

    Intervenor.

Appeal from the United States District Court for the District of South Carolina, at Columbia.  Cameron McGowan Currie, District Judge.  (3:11-cv-03253-CMC)

------

Argued:  October 31, 2013          Decided:  December 16, 2013

------

Before TRAXLER, Chief Judge, and KING and THACKER, Circuit Judges.

------

Affirmed by published opinion.  Judge Thacker wrote the opinion, in which Chief Judge Traxler and Judge King joined.

------

**ARGUED:** Kevin Alan Hall, WOMBLE CARLYLE SANDRIDGE & RICE, LLP, Columbia, South Carolina, for Appellants.  Andrew Sims Radeker, HARRISON & RADEKER, PA, Columbia, South Carolina, for Appellees.
**ON BRIEF:** M. Todd Carroll, Karl S. Bowers, Jr., WOMBLE CARLYLE SANDRIDGE & RICE, LLP, Columbia, South Carolina, for Appellant Governor Nikki R. Haley.  Michael S. Pauley, Vinton D. Lide, LIDE AND PAULEY, LLC, Lexington, South Carolina, for All Remaining Appellants.  Robert J. Butcher, Deborah J. Butcher, Ronald Wade Moak, THE CAMDEN LAW FIRM, PA, Camden, South Carolina, for Appellees.

------

THACKER, Circuit Judge:

For 31 continuous days, a group of individuals, referring to themselves as "Occupy Columbia," conducted a 24-hour per day protest on the grounds of the South Carolina State House in Columbia, South Carolina. On November 16, 2011, South Carolina Governor Nikki Haley directed law enforcement to remove any individual associated with Occupy Columbia who remained on State House grounds after 6:00 p.m. that day. Shortly after 6:00 p.m. on the evening of November 16, 2011, 19 members of Occupy Columbia remained on State House grounds. They were all arrested.

Appellees, Occupy Columbia and 14 individual protestors (collectively, "Occupy Columbia"), brought this action against a number of individuals, including Governor Haley; Leroy Smith, Director of the Department of Public Safety; Zachary Wise, Chief of Police of the Bureau of Protective Services; and four South Carolina law enforcement officers (collectively, "Appellants"), seeking injunctive relief and damages pursuant to 42 U.S.C. § 1983, the South Carolina Constitution, and South Carolina's common law.[1] Appellants

---

[1] Occupy Columbia also sued State Senator Harvey S. Peeler, Jr. and the State of South Carolina. The claims against Senator Peeler and the State of South Carolina were dismissed without prejudice on December 14, 2011. Finally, Occupy Columbia sued various members of the Budget and Control Board and the Division
(Continued)

3

sought dismissal pursuant to Rule 12(b)(6) or Rule 12(c) of the Federal Rules of Civil Procedure. In granting in part and denying in part Appellants' motion, the district court rejected Appellants' assertions of qualified immunity at this stage in the proceedings.

In this appeal, Appellants seek review of the district court's denial of qualified immunity. Because Occupy Columbia has alleged a violation of a clearly established First Amendment right -- that is, the right to protest on State House grounds after 6:00 p.m. in the absence of a valid time, place, and manner restriction -- we affirm.

I.

A.

On October 15, 2011, Occupy Columbia began a 24-hour per day protest on the grounds of the South Carolina State House in Columbia, South Carolina. Occupy Columbia alleges that its "occupation" consisted of "protesting around-the-clock" at the

of General Services, including the State Treasurer, the State Comptroller General, the Chairman of the Senate Finance Committee, and the Chairman of the House Ways and Means Committee (the "Budget and Control Board Defendants"). The claims against the Budget and Control Board Defendants were dismissed as moot on August 17, 2012.

4

State House.  J.A. 114 (Third Am. Compl. ("Compl.") ¶ 34).[2] According to Occupy Columbia, "[p]hysically occupying the State House grounds, including sleeping overnight on the grounds, is the only effective manner in which Occupy Columbia members can express their message of taking back our state to create a more just, economically egalitarian society."  Id. (Compl. ¶ 35).

In its Third Amended Complaint, Occupy Columbia alleges that after its members "inquired as to permitting requirements" for the State House grounds, they were given a handout from the Budget and Control Board's Division of General Services (the "Division of General Services") and were "told they would probably not receive a permit if they applied."  J.A. 117 (Compl. ¶ 50).[3]  In any event, Occupy Columbia alleges, "no application for a permit is available on any public source such as the internet or at the front counter of the Division of General Services."  Id. (Compl. ¶ 51).  Moreover, a member of the Division of General Services allegedly later informed Occupy Columbia "that under no circumstances would any permission to

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[3] The Division of General Services is responsible for "maintain[ing] the grounds surrounding the State House."  J.A. 340 (Answer ¶ 15).

sleep or use tents on the State House grounds" have been given. Id. (Compl. ¶ 50).

On November 16, 2011, after 31 days of Occupy Columbia's continuous "occupation" of State House grounds, State Senator Harvey S. Peeler, Jr. sent a letter to Governor Haley asking "what the Budget and Control Board will be doing about the Occupy Columbia group" in light of the approaching holiday season "and with the Governor's Carol Lighting on November 28th." J.A. 135. Governor Haley responded that very day by sending a letter to the Director of the Department of Public Safety and to the Chief of Police of the Bureau of Protective Services seeking their "assistance in removing any individual associated with the 'Occupy Columbia' group, as well as his or her belongings, who remains on Statehouse grounds after 6:00 p.m. without written authorization from the Budget and Control Board." Id. at 133. In her letter, Governor Haley cited a Budget and Control Board policy "requir[ing] any individual or organization that wishes to remain at the Statehouse after 6:00 p.m. to receive written permission from the agency." Id. at 132.

In support of this purported 6:00 p.m. policy, Governor Haley relied on a document entitled "Conditions for Use of South Carolina State House Grounds" (the "Conditions for Use"). Paragraph 8 of the Conditions for Use provided:

6

All activities on the grounds or in the State House must strictly adhere to the times as scheduled to insure that the activities will not conflict with any other scheduled activities. Activities will not be scheduled beyond 5:00 p.m. in the State House and 6:00 p.m. on the grounds unless special provisions in writing have been made to extend the time.

Id. at 250 (Compl. Ex. 7) ("Condition 8").

Governor Haley's letter continued by explaining, "no one associated with the 'Occupy Columbia' group appears to have even sought such permission, much less received it, yet they have essentially taken to living on Statehouse property." J.A. 132. Finally, Governor Haley's letter indicated that there were a number of problems associated with Occupy Columbia, including damage to the State House grounds and the need for extra security. In addition to her letter, Governor Haley held a press conference on November 16, 2011, during which she explained that anyone present on State House grounds after 6:00 p.m. that evening would be removed.

Shortly after 6:00 p.m. on the evening of November 16, 2011, 19 members of Occupy Columbia remained on State House grounds. They were all arrested. Occupy Columbia alleges that at the time of the arrests, its members "were assembled on the [S]tate [H]ouse grounds, protesting and petitioning our government, and [they] were not violating any law." J.A. 122-23 (Compl. ¶ 83). During the early morning hours of November 17, 2011, those members of Occupy Columbia who were arrested were

7

released from the detention center on their personal recognizance. All charges against them were ultimately dismissed.

B.

On November 23, 2011, Occupy Columbia filed suit in state court against a number of individuals, including Appellants. The lawsuit sought an order enjoining Appellants from interfering with Occupy Columbia's 24-hour occupation of the State House grounds. The state court issued an ex parte temporary restraining order ("TRO"), authorizing Occupy Columbia to continue occupying the State House grounds. On November 30, 2011, Appellants removed this case to federal court, and the parties agreed to extend the state court's TRO until 5:00 p.m. on December 15, 2011.

On December 14, 2011, the district court granted Occupy Columbia's motion for a preliminary injunction, finding that Appellants' "6:00 p.m. policy" and any unwritten or informal rules prohibiting camping or sleeping on State House grounds were not valid time, place, and manner restrictions on Occupy Columbia's First Amendment rights. The district court explained that although Appellants were permitted to regulate camping and sleeping on State House grounds with reasonable time, place, and manner restrictions, no such restrictions existed in October or November of 2011.

8

After the district court granted Occupy Columbia's motion for preliminary injunction, the Budget and Control Board passed an emergency regulation on December 20, 2011, pursuant to its authority under S.C. Code §§ 10-1-30 and 1-23-130.[4] This emergency regulation prohibited the "use of the State House grounds and all buildings located on the grounds for camping, sleeping, or any living accommodation purposes" ("Regulation 19-480"). J.A. 106.[5] In light of Regulation 19-480, Occupy Columbia and Appellants filed cross-motions to modify the preliminary injunction order. The district court denied both motions, concluding that amendments to the preliminary

_____

[4] Pursuant to S.C. Code § 10-1-30, the Director of the Division of General Services "may authorize the use of the State House lobbies, the State House steps and grounds, and other public buildings and grounds in accordance with regulations promulgated by the board." S.C. Code § 10-1-30. Any such "regulations must contain provisions to insure that the public health, safety, and welfare will be protected in the use of the areas including reasonable time, place, and manner restrictions and application periods before use." Id. Finally, "[o]ther restrictions may be imposed on the use of the areas as are necessary for the conduct of business in those areas and the maintenance of the dignity, decorum, and aesthetics of the areas." Id.

In addition, pursuant to S.C. Code § 1-23-130(A), "[i]f an agency finds that an imminent peril to public health, safety, or welfare requires immediate promulgation of an emergency regulation before compliance with the procedures prescribed in this article . . . , the agency may file the regulation with the Legislative Council and a statement of the situation requiring immediate promulgation." S.C. Code § 1-23-130(A).

[5] Regulation 19-480 was codified at S.C. Code § 10-1-35 on March 29, 2012. See 2012 S.C. Acts 134.

9

injunction order were unnecessary because the order only enjoined any current policy, not any new policy or regulation, such as Regulation 19-480. The district court further held that Regulation 19-480 was a valid time, place, and manner restriction.

On January 5, 2012, Occupy Columbia filed a Second Amended Complaint, adding a claim for damages pursuant to 42 U.S.C. § 1983.[6] On January 19, 2012, the Budget and Control Board Defendants moved to dismiss the Second Amended Complaint pursuant Federal Rule Civil Procedure 12(b)(1), arguing that Regulation 19-480 mooted the claims against them. During briefing of that motion, Occupy Columbia revealed that the Budget and Control Board had revised Condition 8 on January 10, 2012. The revised Condition 8 deleted any references to specific time limitations for the use of State House grounds. Therefore, on August 17, 2012, the district court granted the Budget and Control Board Defendants' motion to dismiss, holding that Occupy Columbia's claims for injunctive relief against the Budget and Control Board Defendants were mooted by S.C. Code

---

[6] The caption in Occupy Columbia's First Amended Complaint, which was filed on January 3, 2012, "failed to accurately reflect the Defendants" in the case. J.A. 21. As such, the district court directed Occupy Columbia "to file a Second Amended Complaint no later than January 6, 2012, making only this correction." Id.

10

§ 10-1-35 (formerly Regulation 19-480) and the removal of the 6:00 p.m. policy from Condition 8.

Occupy Columbia filed a Third Amended Complaint on September 20, 2012, adding additional plaintiffs to the case. On October 1, 2012, Appellants moved to dismiss the Third Amended Complaint or for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c), arguing that Occupy Columbia's claims for injunctive relief were moot, and that Appellants were entitled to qualified immunity as to Occupy Columbia's claims for damages. On February 7, 2013, the district court dismissed as moot Occupy Columbia's claims for injunctive relief. However, the district court denied the motion to dismiss Occupy Columbia's claims for damages, concluding that Appellants were not entitled to qualified immunity at this stage.

In addressing Appellants' qualified immunity arguments, the district court first agreed with Appellants "that it was not clearly established at the time of [Occupy Columbia]'s arrests that there was a constitutional right to camp, sleep, or live continuously on the State House grounds." J.A. 423-24. However, the district court then reviewed the allegations in the Third Amended Complaint and concluded that Occupy Columbia had also alleged that their "constitutional rights were violated when they were arrested for their presence

11

and protests on the State House grounds after 6:00 p.m." Id. at 424. As to this separately alleged constitutional violation, the district court rejected Appellants' qualified immunity argument and held that "it was clearly established that [Occupy Columbia] had a First Amendment right to protest absent a valid time, place, and manner restriction." Id. at 431. Therefore, the district court concluded Appellants were not entitled to qualified immunity on the § 1983 claims for damages as alleged in the Third Amended Complaint.

## II.

On February 25, 2013, Appellants filed a notice of appeal, seeking review of the district court's qualified immunity ruling. Ordinarily, we do not possess appellate jurisdiction over interlocutory orders -- such as the denial of a Rule 12(b)(6) motion to dismiss or the denial of a Rule 12(c) motion for judgment on the pleadings -- because such decisions are not final judgments within the meaning of 28 U.S.C. § 1291. See Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 304 (4th Cir. 2006) (explaining that generally, a district court's denial of a Rule 12(b)(6) motion is not an appealable ruling); Coleman by Lee v. Stanziani, 735 F.2d 118, 120 (3d Cir. 1984) ("An order denying a Rule 12(c) motion . . . is a prime example of an interlocutory order."). A district court's denial of qualified immunity, however, "is immediately appealable under

12

the collateral order doctrine to the extent that the availability of this defense turns on a question of law." Ridpath, 447 F.3d at 305 (citing Mitchell v. Forsyth, 472 U.S. 511, 530 (1985)). "This principle applies whether qualified immunity was rejected at the dismissal stage (as in these proceedings), or at the summary judgment stage." Id. Therefore, because the district court's decision here turned on a question of law, we possess jurisdiction under the collateral order doctrine to review the denial of qualified immunity.

## III.

### A.

A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standards as a motion to dismiss under Rule 12(b)(6). See Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). As such, we review de novo a district court's denial of qualified immunity raised in a motion under either Rule 12(b)(6) or Rule 12(c). See id.; Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006).

A motion to dismiss tests the sufficiency of a complaint. See Butler v. United States, 702 F.3d 749, 752 (4th Cir. 2012). To survive such a motion, the complaint must contain facts sufficient "to raise a right to relief above the speculative level" and "state a claim to relief that is

13

plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). "Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011) (internal quotation marks omitted). One such defense is qualified immunity. See id.

B.

Occupy Columbia relies on several exhibits and affidavits -- all of which were "incorporated . . . by reference" to the Third Amended Complaint, see J.A. 109 (Compl. ¶ 7) -- in support of its argument that Appellants are not entitled to qualified immunity. Specifically, Occupy Columbia cites a number of affidavits to explain that, in response to Governor Haley's November 16, 2011 letter and press conference, members of Occupy Columbia removed all camping supplies from the State House grounds by 5:15 p.m. See Appellees' Br. 9-10 (citing J.A. 233-34, 238-39, 245-46, 304). We must therefore define the universe of documents we may consider in evaluating this appeal.

In resolving a motion pursuant to Rule 12(b)(6) or Rule 12(c), a district court cannot consider matters outside the

14

pleadings without converting the motion into one for summary judgment. Fed. R. Civ. P. 12(d). A court may, however, consider a "written instrument" attached as an exhibit to a pleading, see Fed. R. Civ. P. 10(c), "as well as [documents] attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Rule 10(c) states, "[a] copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes." Fed. R. Civ. P. 10(c) (emphasis supplied). There is no uniform rule among the circuits with respect to whether an affidavit attached as an exhibit to a pleading is a "written instrument" such that it may be considered by a district court in resolving a Rule 12(b)(6) or Rule 12(c) motion.

The Third Circuit has held that an affidavit does not constitute a "written instrument" within the meaning of Rule 10(c). Rose v. Bartle, 871 F.2d 331, 339 n.3 (3d Cir. 1989). "To hold otherwise," the court reasoned, "would elevate form over substance by drawing a distinction between an affidavit filed with [a pleading] and an affidavit filed with a motion to dismiss under Rule 12(b)(6)." Id. The court noted, "the types of exhibits incorporated within the pleadings by Rule 10(c) consist largely of documentary evidence, specifically, contracts, notes, and other writing[s] on which [a party's]

15

action or defense is based." Id. (internal quotation marks omitted). Finally, the court explained that considering affidavits "would further blur the distinction between summary judgment and dismissal for failure to state a claim upon which relief could be granted." Id.

In contrast, the Seventh Circuit "has interpreted the term 'written instrument' as used in Rule 10(c) to include documents such as affidavits," N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 453 (7th Cir. 1998), explaining that it "believe[s] the broader interpretation comports with the traditionally generous nature in which [the court] view[s] pleadings," id. at 453 n.4; see also Schnell v. City of Chicago, 407 F.2d 1084, 1085 (7th Cir. 1969), overruled on other grounds by City of Kenosha v. Bruno, 412 U.S. 507 (1973).

We need not decide the propriety of considering an affidavit attached as an exhibit to a pleading in the instant appeal. Here, the district court refused to consider any of the "affidavits purportedly incorporated by reference in the Third Amended Complaint" in making its qualified immunity determination. J.A. 417 n.1. In fact, to avoid converting Appellants' motion under Rule 12(b)(6) or Rule 12(c) into a motion for summary judgment, the district court explained it was "rely[ing] solely on the allegations in the Third Amended

16

Complaint and those documents that are integral to the complaint." Id.[7] We will do the same.

Appellants argue that, despite the district court's explicit statement to the contrary, the court did in fact rely on materials outside of the Third Amended Complaint in denying Appellants' motion to dismiss. See Appellants' Br. 8. Specifically, Appellants contend that the district court's order incorporated by reference its earlier rulings on Occupy Columbia's motion for preliminary injunction, which contained evidentiary evaluations. In addition, Appellants note the district court's order referenced the Budget and Control Board Defendants' previous statements in this litigation concerning how the Budget and Control Board regulated the State House

---

[7] According to the district court, the following documents were integral to the complaint: (1) Governor Haley's letter to Appellants Smith and Wise; (2) Senator Peeler's letter to Governor Haley; and (3) the Budget and Control Board's Conditions for Use. J.A. 417 n.1. We agree and note that, even at the Rule 12(b)(6) or Rule 12(c) stage, the district court properly considered these documents. Not only can they be fairly characterized as written instruments attached to the Third Amended Complaint, see Fed. R. Civ. P. 10(c), but they were also explicitly relied on by the parties in briefing the Rule 12(b)(6) or Rule 12(c) motion, and their authenticity has not been disputed, see Philips, 572 F.3d at 180; Blankenship v. Manchin, 471 F.3d 523, 526 n.1 (4th Cir. 2006).

The district court further noted that even if it were to consider the affidavits, it "would reach the same result as the affidavits support [Occupy Columbia]'s position." J.A. 417 n.1.

17

grounds. After carefully reviewing the district court's order below, we are not persuaded by Appellants' contentions.

To the extent the district court mentioned materials beyond the Third Amended Complaint and attached exhibits, it appears the court was doing so for illustrative and background purposes only -- the court did not rely on those materials in making its qualified immunity determination. Indeed, the district court referred to its earlier rulings on Occupy Columbia's motion for preliminary injunction through footnotes in its "Background" section, simply explaining that it "assumes familiarity" with these orders. J.A. 419 n.4. As for the Budget and Control Board Defendants' previous statements in this litigation, the court's "find[ing] that there was no time restriction on protests on State House grounds," id. at 426, is supported simply by the text of Condition 8. See id. at 425-26 (characterizing Condition 8 as a method for obtaining reservations and explaining that "[t]he text of Condition 8 neither purported to close the State House grounds to protestors after 6:00 p.m. 'unless special provisions in writing' were obtained, nor to authorize the arrests of protestors for their presence on the grounds after 6:00 p.m. if they did not receive 'special provisions in writing'").

IV.

Appellants argue that they are entitled to qualified immunity. Qualified immunity is an affirmative defense that "shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted). Qualified immunity does not protect government officials when they are "plainly incompetent or . . . knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "But, in gray areas, where the law is unsettled or murky, qualified immunity affords protection to [a government official] who takes an action that is not clearly forbidden -- even if the action is later deemed wrongful." Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir. 2001) (internal quotation marks omitted).

Government officials are entitled to the defense of qualified immunity unless a § 1983 claim satisfies the following two-prong test: "(1) the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have

19

known." Ridpath, 447 F.3d at 306 (internal quotation marks omitted).

                                    A.

Before proceeding to the two-prong qualified immunity test, "our first task is to identify the specific right that [Occupy Columbia] asserts was infringed by the challenged conduct, recognizing that the right must be defined at the appropriate level of particularity." Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc). Appellants' primary contention on appeal is that the district court "incorrectly defined the alleged right at issue" as a generalized right to protest on public property, rather than a right to live continuously on State House grounds. Appellants' Br. 13. This threshold error, according to Appellants, caused the district court to misapply both prongs of the qualified immunity analysis outlined above. We disagree.

A careful examination of the Third Amended Complaint and the attached exhibits (excluding the affidavits) leads us to conclude that Occupy Columbia has alleged two separate First Amendment violations, arising out of: (1) the requirement that Occupy Columbia vacate State House grounds by 6:00 p.m. on November 16, 2011; and (2) the arrest of members of Occupy Columbia when they were assembled on State House grounds after 6:00 p.m. on November 16, 2011.

1.

There is no doubt Occupy Columbia's pleadings more than sufficiently allege that Appellants violated Occupy Columbia's First Amendment rights by requiring Occupy Columbia to vacate State House grounds by 6:00 p.m. on November 16, 2011. The Third Amended Complaint is clear that Occupy Columbia's "occupation" consisted of "protesting around-the-clock" at the State House. J.A. 114 (Compl. ¶ 34). Occupy Columbia alleges, "[p]hysically occupying the State House grounds, including sleeping overnight on the grounds, is the only effective manner in which Occupy Columbia members can express their message of taking back our state to create a more just, economically egalitarian society." Id. (Compl. ¶ 35). Indeed, as part of its occupation, Occupy Columbia established a "medical committee," a "food service committee," and a "security committee." Id. at 118 (Compl. ¶ 57). Throughout its Third Amended Complaint, Occupy Columbia asserts that its First Amendment rights were violated when Appellants prevented members of Occupy Columbia from engaging in the expressive conduct of living continuously on State House grounds. Therefore, Occupy Columbia has unquestionably alleged that its First Amendment rights were violated when Appellants required its members to remove their camping equipment and vacate the State House grounds by 6:00 p.m. on November 16, 2011.

21

With this first alleged constitutional violation in mind, the district court briefly analyzed Appellants' qualified immunity defense and held that, at the time of Occupy Columbia's removal from State House grounds, it was not clearly established that camping, sleeping, or living continuously on public property was expressive conduct protected by the First Amendment. The district court explained there are no Supreme Court or Fourth Circuit cases that clearly establish a First Amendment right to camp or sleep on public property in connection with protests. See J.A. 424 n.9 (citing Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984) (assuming without deciding, for purposes of its time, place, and manner analysis, that "overnight sleeping in connection with the demonstration is expressive conduct protected to some extent by the First Amendment")).[8]

---

[8] At least one federal district court has reached the opposite conclusion. See Occupy Nashville v. Haslam, ––– F. Supp. 2d ––––, 2013 WL 2644081, at *15 (M.D. Tenn. June 12, 2013) (denying qualified immunity for state officials and holding that "plaintiffs had a clearly established right to utilize the Plaza to engage in overnight protest activity"). In Occupy Nashville, the United States District Court for the Middle District of Tennessee explained, "[t]he plaintiffs' protests contained a fundamental constitutional core, regardless of the secondary effects that resulted from the manner in which they chose to exercise it." Id. "At any rate, the plaintiffs were not arrested because of those secondary effects, they were arrested for their presence on the Plaza, even though no law . . . prevented them from being present there." Id. (emphasis in original).

22

The district court did not decide whether Occupy Columbia's allegations would in fact substantiate a First Amendment violation because, assuming a right to camp and sleep on public property as part of a protest exists, it was not clearly established. Accordingly, the court held that the defense of qualified immunity barred any claims for damages against Appellants arising out of the first alleged constitutional violation. This holding is not the subject of the instant appeal.[9]

2.

We next examine whether Occupy Columbia's pleadings sufficiently allege that Appellants violated Occupy Columbia's

---

[9] Nevertheless, Occupy Columbia asks us to "hold that the camping and sleeping in which Occupy Columbia was engaged at the State House was constitutionally protected speech." Appellees' Br. 45. This issue is not before us. Indeed, the district court's grant of qualified immunity with respect to the first alleged constitutional violation was not a final appealable order because it did not dispose of all of Occupy Columbia's claims against Appellants. See United States v. Myers, 593 F.3d 338, 344 (4th Cir. 2010) ("Generally, a final decision ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." (internal quotation marks omitted)). Moreover, Occupy Columbia has not asked us to exercise pendent appellate jurisdiction to consider this issue. See Evans v. Chalmers, 703 F.3d 636, 658 (4th Cir. 2012) ("Our exercise of pendent appellate jurisdiction is proper only when an issue is (1) inextricably intertwined with the decision of the lower court to deny qualified immunity or (2) consideration of the additional issue is necessary to ensure meaningful review of the qualified immunity question." (internal quotation marks omitted)).

23

First Amendment rights by arresting them for their presence and protest on State House grounds after 6:00 p.m. on November 16, 2011. Appellants contend Occupy Columbia's pleadings allege only a violation of "the right to live indefinitely on public property." Appellants' Br. 17. According to Appellants, "the Constitution does not guarantee a right to squat indefinitely on public property, which is precisely what the [members of Occupy Columbia] allege they were doing before and at the time they were arrested." Id. at 14 (emphasis supplied). Occupy Columbia argues, however, "[w]hen the facts are viewed in Occupy Columbia's favor, the third amended complaint suggests that the Occupy Columbia arrestees were arrested when they were simply protesting as part of Occupy Columbia." Appellees' Br. 36.

It is true that at the heart of Occupy Columbia's Third Amended Complaint are allegations that Appellants violated Occupy Columbia's First Amendment rights by interfering with Occupy Columbia's ability to continuously camp and sleep on State House grounds. Specifically, the complaint alleges that Occupy Columbia was determined to establish a "24-hour-per-day/7-days-per-week actual, physical occupation" of the State House grounds. J.A. 113 (Compl. ¶ 27). According to Occupy Columbia's complaint, "literal occupation of the State House grounds 24 hours a day is and . . . was a core component to the Occupy Columbia movement." Id. at 114 (Compl. ¶ 35).

24

Despite Appellants' assertions to the contrary, however, the "right to squat indefinitely on State House grounds" is not the only right Occupy Columbia's Third Amended Complaint alleges was violated. At the time its members were arrested, Occupy Columbia alleges they "were assembled on the [S]tate [H]ouse grounds, protesting and petitioning our government, and . . . were not violating any law." J.A. 122-23 (Compl. ¶ 83) (emphasis supplied). In addition, the Third Amended Complaint alleges that Appellants wrongfully arrested members of Occupy Columbia while they "were exercising their fundamental constitutional rights of Free Speech, Assembly, and Petition." Id. at 122 (Compl. ¶ 81). Occupy Columbia further alleges that its members "had a constitutional right to protest, petition the government, and assemble on [S]tate [H]ouse grounds." Id. at 123 (Compl. ¶ 85) (emphasis supplied). Crucially, these paragraphs do not allege that members of Occupy Columbia were arrested for their continued occupation and camping on the State House grounds. Rather, they state that the arrests occurred when Occupy Columbia was simply assembled on State House grounds for the purpose of protesting and petitioning the government. Thus, Occupy Columbia has pled a separate constitutional violation arising solely out of their arrest for assembling on State House grounds after 6:00 p.m. on November 16, 2011.

25

Moreover, Governor Haley's letter, which prompted the arrests, did not generally order the removal of any individuals who were camping, sleeping, or living on State House grounds. Instead, it was focused solely on Occupy Columbia; it directed Appellant Smith and Appellant Wise to "remov[e] any individual associated with the 'Occupy Columbia' group, as well as his or her belongings, who remains on Statehouse grounds after 6:00 p.m. without written authorization from the Budget and Control Board." J.A. 133; id. at 119 (Compl. ¶ 61). This further supports Occupy Columbia's allegations of a second constitutional violation arising purely out of lawful protest activity.

Accordingly, the district court correctly concluded that Occupy Columbia's complaint and exhibits thereto sufficiently alleged that Appellants violated Occupy Columbia's First Amendment rights when they arrested them for their presence and protest on State House grounds after 6:00 p.m. on November 16, 2011.

B.

Having concluded that the district court correctly defined the right at issue, we must next decide whether Appellants are entitled to dismissal on the basis of qualified immunity. As explained, qualified immunity provides government officials who are performing discretionary functions a defense

26

from liability for § 1983 civil damages unless: "(1) the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted). It is within our discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). Each prong is analyzed below.

### 1.

In reviewing the denial of qualified immunity, "the nature of the right allegedly violated must be defined 'at a high level of particularity.'" Rogers v. Pendelton, 249 F.3d 279, 286 (4th Cir. 2001) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 250-51 (4th Cir. 1999)). Stated at the appropriate level of particularity, the right allegedly violated by Appellants is the right to be present and protest on State House grounds after 6:00 p.m. Therefore, the qualified immunity analysis must begin with this alleged constitutional violation in mind, and we must simply determine "whether [Occupy Columbia's] allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002).

27

The First Amendment guarantees the right to free speech.  U.S. Const. amend. I; <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 837 (1982) ("[I]t is fundamental that the First Amendment prohibits governmental infringement on the right of free speech.").  As the Supreme Court has stated, "[t]here is no doubt that as a general matter peaceful picketing and leafleting are expressive activities involving 'speech' protecting by the First Amendment."  <u>United State v. Grace</u>, 461 U.S. 171, 176 (1983) (collecting cases).  "It is also true that 'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'"  <u>Id.</u> at 177 (collecting cases).  The South Carolina State House grounds are the "site of the State Government," <u>Edwards v. South Carolina</u>, 372 U.S. 229, 235 (1963), and comprise "an area of two city blocks open to the general public," <u>id.</u> at 230.  As such, we treat the area outside of the State House as a public forum for First Amendment purposes.  <u>Cf.</u> <u>Grace</u>, 461 U.S. at 180 ("The public sidewalks forming the perimeter of the Supreme Court grounds, in our view, are public forums and should be treated as such for First Amendment purposes.").[10]

---

[10]  The district court also characterized the State House grounds as a "public forum."  J.A. 11.  The specific character of property affects the government's ability to limit expressive
(Continued)

28

As we have recognized, "[a] bedrock First Amendment principle is that citizens have a right to voice dissent from government policies." Tobey v. Jones, 706 F.3d 379, 391 (4th Cir. 2013). Moreover, speech regarding "matters of public concern . . . is at the heart of the First Amendment's protection." Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758-59 (1985) (internal quotation marks omitted). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." Snyder v. Phelps, 131 S. Ct. 1207, 1216 (2011) (internal quotation marks omitted). Occupy Columbia's Third Amended Complaint sufficiently alleges that its members were engaged in protected speech at the time they were arrested. Specifically, the complaint alleges Occupy Colombia's members were assembled on State House grounds (a public forum) and were "protesting and petitioning our government." J.A. 122-23 (Compl. ¶ 83). Occupy Columbia's allegations thus satisfy the standards to qualify as protected speech.

---

conduct. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983) (describing the differences between: (1) "quintessential public forums;" (2) "public property which the state has opened for use by the public as a place for expressive activity;" and (3) "[p]ublic property which is not by tradition or designation a forum for public communication").

Although Occupy Columbia alleges it was engaged in protected speech, this does not end the inquiry. Even protected speech is subject to government regulation since "protected speech is not equally permissible in all places and at all times." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 799 (1985); see also id. at 799-800 ("Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."). To that end, the state may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983); see also Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (explaining that "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech"). Therefore, in the absence of a valid time, place, and manner restriction, Occupy Columbia had a First Amendment right to assemble on State House grounds after 6:00 p.m., and its Third Amended Complaint sufficiently alleges that this right was violated.

Appellants contend that, at the time of the arrests, South Carolina had in place a series of criminal statutes regulating the use of State House grounds and that those statutes were valid time, place, and manner restrictions. See S.C. Code § 10-11-20 (making it "unlawful to use the State House or grounds for any purpose not authorized by law"); id. § 10-11-30 (making it unlawful "to trespass upon the grass plots or flower beds of the grounds of the State house" or to "cut down, deface, mutilate or otherwise injure any of the statues, trees, shrubs, grasses or flowers on the grounds"); id. § 10-11-330 (making it unlawful "to obstruct or impede passage within the capitol grounds or building"). As valid time, place, and manner restrictions -- the argument goes -- Appellants "could rightly enforce them against [Occupy Columbia]." Appellants' Br. 28 (emphasis supplied). Appellants' argument misses the point.

It may well be that these statutes are in fact valid time, place, and manner restrictions on an individual's ability to protest on State House grounds. It may also be true that, under appropriate circumstances, Appellants could enforce these statutes against individuals on State House grounds, including members of Occupy Columbia. Yet, what Appellants "could" do is irrelevant here. What matters, at this stage, is whether Appellants can demonstrate an entitlement to the defense of qualified immunity based on the Third Amended Complaint and the

31

exhibits attached thereto.  See Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011) (explaining that dismissal "is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense" (emphasis supplied)).

On the face of the Third Amended Complaint, members of Occupy Columbia were violating no law when they were arrested. Instead, the complaint alleges that members of Occupy Columbia were arrested simply for their presence on State House grounds after 6:00 p.m.  The motivation for the arrests, according to the complaint, was Governor Haley's letter, which specifically instructed Appellant Smith and Appellant Wise to "remov[e] any individual associated with the 'Occupy Columbia' group, as well as his or her belongings, who remains on Statehouse grounds after 6:00 p.m. without written authorization from the Budget and Control Board."  J.A. 133.  The Third Amended Complaint contains no allegations to support the notion that Occupy Columbia was violating S.C. Code §§ 10-11-20, 10-11-30, or 10-11-330 when its members were arrested on November 16, 2011. Therefore, at the Rule 12(b)(6) or 12(c) stage, Occupy Columbia has sufficiently alleged a First Amendment violation notwithstanding the existence of these statutes and despite

32

Appellants' contention that the statutes "could" rightly be enforced against Occupy Columbia.[11]

Appellants also argue that Condition 8 was a valid time, place, and manner restriction, requiring Occupy Columbia to receive permission to remain on State House grounds after 6:00 p.m. Again, we are not persuaded.

Condition 8 provides:

> All activities on the grounds or in the State House must strictly adhere to the times as scheduled to insure that the activities will not conflict with any other scheduled activities. Activities will not be scheduled beyond 5:00 p.m. in the State House and 6:00 p.m. on the grounds unless special provisions in writing have been made to extend the time.

J.A. 250 (Compl. Ex. 7). On its face, Condition 8 is simply a mechanism for groups to obtain reservations to utilize the State House grounds in ways that "will not conflict with any other scheduled activities." Id. It does not, as Appellants contend, close the State House grounds to the public at 6:00 p.m., nor does it authorize the arrest of individuals for their presence on State House grounds after 6:00 p.m.

Even if we read Condition 8 as imposing a time, place, and manner restriction, which would require individuals to

---

[11] Occupy Columbia contends that Appellants' argument justifying the arrests under these statutes is not preserved for this appeal. However, we need not decide the preservation issue because, as explained, we do not find Appellants' argument compelling.

receive permission from the Division of General Services to remain on State House grounds after 6:00 p.m., such a restriction would be invalid. As the Supreme Court has made clear, "a time, place, and manner regulation [must] contain adequate standards to guide the official's decision and render it subject to effective judicial review." Thomas v. Chicago Park Dist., 534 U.S. 316, 323 (2002). The Court explained, "[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." Id. (citing Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 131 (1992)). Here, we are unaware of any standards to guide the Division of General Services in deciding whether to grant or deny a permit to remain on State House grounds after 6:00 p.m. Indeed, neither Condition 8 nor the other Conditions of Use articulate any such standards. Accordingly, Condition 8 was not a valid time, place, and manner restriction that could have justified the arrests of the members of Occupy Columbia.

2.

Having concluded that Occupy Columbia's complaint sufficiently alleges that arresting its members for their presence and protests on State House grounds after 6:00 p.m. constituted a violation of their First Amendment rights, we must

34

turn to the second prong of the qualified immunity analysis. "The second prong is 'a test that focuses on the objective legal reasonableness of an official's acts.'" Henry v. Purnell, 652 F.3d 524, 534 (4th Cir. 2011) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). At this stage, we must assess whether the First Amendment right allegedly violated by Appellants was a "clearly established" right "of which a reasonable person would have known." Mellen v. Bunting, 327 F.3d 355, 365 (4th Cir. 2003) (internal quotation marks omitted)).

When deciding whether a right is clearly established, we ask "'whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" Henry, 652 F.3d at 534 (quoting Saucier v. Katz, 533 U.S. 194, 205 (2001)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 239 (1987) (internal citations omitted); see also Brockington, 637 F.3d at 508 ("Importantly, it is not required that the exact conduct has been found unconstitutional in a previous case."). Whether a right is clearly established depends on the law of the relevant jurisdiction. See Edwards, 178 F.3d at 250-51 ("In determining

35

whether a right was clearly established at the time of the claimed violation, courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." (alteration in original and internal quotation marks omitted)).

The question we must therefore ask is, on November 16, 2011, was it clearly established in Fourth Circuit and Supreme Court precedent that, in the absence of a valid time, place, and manner restriction, arresting members of Occupy Columbia for their presence and protest on State House grounds after 6:00 p.m. was a violation of their First Amendment rights. In light of the First Amendment case law described above (and again briefly summarized below), we must answer this question in the affirmative.

"A bedrock First Amendment principle is that citizens have a right to voice dissent from government policies." Tobey, 706 F.3d at 391 (citing Mills v. Alabama, 384 U.S. 214, 218 (1966)). Indeed, "it is fundamental that the First Amendment prohibits governmental infringement on the right of free speech." Rendell-Baker, 457 U.S. at 837. Moreover, when that speech takes place in a "quintessential public forum," the ability "of the state to limit expressive activity are sharply circumscribed." Perry, 460 U.S. at 45. Of course, "even in a

36

public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech." Ward, 491 U.S. at 791.

It is not disputed that South Carolina and its state officials could have restricted the time when the State House grounds are open to the public with a valid time, place, and manner restriction. However, as explained above, at the time of Occupy Columbia's arrest, no such restrictions existed. In light of the case law from this circuit and from the Supreme Court, it was clearly established on November 16, 2011, that arresting Occupy Columbia for protesting on State House grounds after 6:00 p.m. was a First Amendment violation. Accordingly, at this stage, Appellants are not entitled to qualified immunity for damages arising out of Occupy Columbia's arrest on November 16, 2011.

V.

In sum, we hold that the Occupy Columbia protesters have stated a viable claim that Appellants violated their First Amendment rights to assemble and protest peacefully on the grounds of the South Carolina State House in the absence of a valid time, place, or manner regulation. Condition 8 did not constitute a valid regulation because on its face it imposed no limit on when the State House grounds were open to the public and, even if it had restricted the time during which protesters

37

could assemble, it did not contain any standards to guide the official's decision regarding when to grant special permission to continue such activities beyond closing time. Furthermore, at this point in the proceedings, we cannot say as a matter of law that the state statutes upon which Appellants rely are valid applicable time, place, and manner restrictions. For purposes of this motion, we must accept as true Occupy Columbia's assertion that its members gathered in a peaceful and lawful manner and conclude that the protesters were not violating any law. Based on the complaint, there were no existing time, place, and manner restrictions on the protesters' First Amendment activities on the State House grounds. Therefore, Appellants violated these rights by removing the protesters from the grounds.

We also hold that the right of the protesters to assemble and speak out against the government on the State House grounds in the absence of valid time, place, and manner restrictions has been clearly established since Edwards v. South Carolina, 372 U.S. 229, 235 (1963).

Accordingly, we affirm the district court's denial of qualified immunity at this stage of the proceedings.

AFFIRMED

38