RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0253p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

OCCUPY NASHVILLE, et al.,

*Plaintiffs*,

PAULA ELAINE PAINTER; LAUREN MARIE PLUMMER; ADAM KENNETH KNIGHT; WILLIAM W. HOWELL; DARRIA HUDSON; KATY SAVAGE,

*Plaintiffs-Appellees*,

*v.*

WILLIAM HASLAM, et al.,

*Defendants*,

WILLIAM L. GIBBONS, Commissioner of the Tennessee Department of Safety; STEVEN G. CATES, Commissioner of the Tennessee Department of General Services,

*Defendants-Appellants*.

No. 13-5882

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:11-cv-01037—Aleta Arthur Trauger, District Judge.

Argued: August 25, 2014

Decided and Filed: October 8, 2014

Before: SENTELLE, BENTON and JORDAN, Circuit Judges[*]

---

[*]The Honorable David Bryan Sentelle, United States Circuit Judge for the District of Columbia Circuit, the Honorable Duane Benton, United States Circuit Judge for the Eighth Circuit, and the Honorable Kent A. Jordan, United States Circuit Judge for the Third Circuit, were designated by the Committee on Intercircuit Assignments of the Judicial Conference of the United States to comprise the panel for this appeal.

---

**COUNSEL**

---

**ARGUED:** Dawn M. Jordan, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants.  C. David Briley, BONE MCALLESTER NORTON, PLLC, Nashville, Tennessee, for Appellees.  **ON BRIEF:** Dawn M. Jordan, Heather C. Ross, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants.  C. David Briley, BONE MCALLESTER NORTON, PLLC, Nashville, Tennessee, Thomas H. Castelli, ACLU FOUNDATION OF TENNESSEE, Nashville, Tennessee, Tricia Herzfeld, OZMENT LAW, Nashville, Tennessee, for Appellees.

---

**OPINION**

---

JORDAN, Circuit Judge.  In October 2011, a group of protesters calling themselves "Occupy Nashville" established an around-the-clock presence on the Nashville War Memorial Plaza  (the "Plaza") in Nashville, Tennessee, with the aim of bringing attention to disparities in wealth and power in the United States.[1]  *Occupy Nashville v. Haslam*, 949 F. Supp. 2d 777, 785 (M.D. Tenn. 2013).  After several weeks of occupying the Plaza, representatives of the protesters sought a meeting with state officials to discuss safety and health concerns that had developed in the course of the lengthy demonstration.  The state agreed that the concerns had to be addressed and adopted a new policy that, in relevant part, imposed a curfew for the Plaza.  Six individuals associated with the demonstration (the "Protesters") were later arrested for violating that curfew,[2] and they brought claims under 42 U.S.C. § 1983 against various state officials, alleging, in relevant part, violations of rights under the First, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

Two of those officials – William L. Gibbons, Commissioner of the Tennessee Department of Safety ("DOS"), and Steven L. Cates, Commissioner of the Tennessee

---

[1]Occupy Nashville was one of many such movements manifesting themselves in several major cities in the United States. *Occupy Nashville v. Haslam*, 949 F. Supp. 2d 777, 785 (M.D. Tenn. 2013).

[2]The Protesters are Paula Elaine Painter, Lauren Marie Plummer, Adam Kenneth Knight, William W. Howell, Darria Hudson, and Katy Savage.  A seventh plaintiff, Malina Shannon, also filed suit but was dismissed from the case and has not appealed. *Occupy Nashville*, 949 F. Supp. 2d at 806-07.

Department of General Services ("DGS") (collectively, the "State Officials") – now appeal from a ruling of the United States District Court for the Middle District of Tennessee that they are not entitled to qualified immunity and are personally liable for damages. While this appeal raises a number of important First Amendment issues, the dispositive question before us is whether, pursuant to a policy that may have been promulgated in derogation of Tennessee's version of the Uniform Administrative Procedures Act (the "UAPA"), the State Officials violated clearly established constitutional rights by authorizing the arrest of people violating the curfew established for the Plaza. We hold that the State Officials are protected by qualified immunity because, regardless of the specifics of Tennessee's administrative law, the Protesters' claimed First Amendment right to unrestricted 24-hour access to the Plaza is not clearly established. We will therefore reverse the District Court's order.

## I.      BACKGROUND[3]

### A.  Factual Background

#### 1. *The Plaza and the Old Policy*

The Plaza, site of the Occupy Nashville demonstration, serves as an open-air monument "to the soldiers who served for the State of Tennessee during World War I." (D.I. 80 at 3.)[4] It is made up of the "surface above, or roof," of the Legislative Plaza, an underground building that houses offices for the Tennessee legislature, as well as meeting spaces and parking facilities. (*Id.* at 2.) The Plaza is part of a larger Capitol Complex, which is a set of interconnected buildings that includes the Tennessee State Capitol, the War Memorial Building, and accompanying grounds. The Plaza is covered with "porous granite" stones that are "approximately 3 inches thick and raised 12-18 inches above the roof membrane system" atop the underground facilities.[5] (*Id.* at 4.) The DOS is charged with providing a police force to maintain state property. *See*

---

[3]Consistent with our standard of review, *see infra* note 15, we "view the facts and draw reasonable inferences 'in the light most favorable to the part[ies] opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007), which, for purposes of the qualified immunity analysis here, are the Protesters.

[4]We will use the abbreviation "D.I." to refer to docket items on the District Court's docket.

[5]The porous granite stones can only tolerate certain weight and will break if impacted or loaded for long periods of time beyond their capacity. "The walk-able roof/Plaza is designed to accommodate only light to medium volume of dispersed weight … . Usage outside this parameter must be controlled, or it could cause … failure to the roof …." (D.I. 80 at 8.)

Tenn. Code Ann. § 4-3-2006 (creating within DOS a "division of protective services" to provide police services for state buildings, including the Capitol Complex). The DGS, which "exercise[s] general custodial care of real property of the state," Tenn. Code Ann. § 4-3-1105(12), is "charged with the care and maintenance of [the] Plaza," and, pursuant to that charge, it may implement policy for the use of the Plaza. (D.I. 18, ex. 2 at 1.)

In October 2011, the use of the Plaza was governed by what was called the Public Use of War Memorial Plaza Policy (the "Old Policy"), as implemented by the DGS.[6] (D.I. 18, ex.2 at 1.) Under the Old Policy, there was no limitation on overnight use of the Plaza, nor any requirement that a permit be obtained. Specifically, the Old Policy provided that "[t]he Plaza may be used free of charge by any person or group for expressive activity on a first come first serve basis." (*Id.*) Priority was given, however, to a person or group who had previously reserved the Plaza. (*See* D.I. 18, ex. 2 at 1 ("However, a person or group having previously entered into a User Agreement … shall have first rights for use of the Plaza as provided in the User Agreement.").) To secure reserved use of the Plaza, an organization needed to pay a fee and obtain liability insurance, among other administrative requirements.

## 2. *The protest and growing health and safety concerns*

By October 9, 2011, the Occupy Nashville participants had established a 24-hour-a-day protest on the Plaza. They brought food, drinks, supplies, and political signs, and set up tents for camping.[7] State Capitol Complex Facilities Administrator David Carpenter was responsible for the day-to-day operations of the Plaza. Tennessee Highway Patrol Lieutenant Preston Donaldson also had responsibility for the Plaza, being the supervisor in charge of security. He

---

[6]The District Court refers to the "Old Policy" as the "Old Rules," despite the fact that "neither side knows the origin" of the policy or "whether or not it was actually promulgated pursuant to the [state's UAPA]." *Occupy Nashville*, 949 F. Supp. 2d at 796. Given that the designation of something as a "rule" is sometimes taken as reflecting a legal determination dependent upon procedural requirements, we will refer to the document as it is referred to in its own text, *i.e.*, as a "policy."

[7]The State Officials asserted in their statement of undisputed facts in the District Court that the protesters "set up tents to sleep in, set up a food tent with a Coleman stove, set up a donation area for tents, sleeping bags, food, water, and other donated items, [and] brought sleeping bags with the intention of sleeping there to demonstrate their alleged property right in the Plaza, the right to 'occupy.'" (D.I. 71 at 11.) In response, the Protesters disputed whether the demonstrators "ever claimed to have a property right in the Plaza" but did not – and clearly could not, on this record – dispute the fact that participants in the protest slept on the Plaza overnight on an ongoing basis. (*See, e.g.*, Appellees's Br. at 7 (describing themselves as having "set up tents and sleeping bags for overnight accommodation, utilized cooking stoves and laptops, and set up a food and drink tent... .")

asked his officers to periodically look in on Occupy Nashville "to check on [the demonstrators'] welfare." (D.I. 80 at 13.) A local attorney, William "Tripp" Hunt, acted as a voluntary liaison for the demonstrators to establish a line of communication with DGS General Counsel Thaddeus Watkins. (*Id.* at 14.)

Problems surfaced quickly: "[t]here were issues with human feces, urine, trash, damage to the Plaza, and other issues . . . ." (*Id.* at 17.) Nevertheless, the first weeks of the protest went "fairly smoothly." (*Id.*) For instance, Carpenter, Donaldson, and Watkins, communicated with Hunt about an event called the Southern Book Festival, which was scheduled to occur on the Plaza October 14-16, 2011, and, by cooperative effort, the protest and the festival were able to occur on the Plaza simultaneously.

By the end of October, however, the size of the protest had grown, and conditions had deteriorated. Many homeless people had moved onto the Plaza, "enjoying the sleeping bags and tents and food" of Occupy Nashville, and it became difficult to distinguish between Occupy Nashville participants and non-participants. (D.I. 72, ex. 4 at 15.) There was also an increase in the number of assault complaints and damage to public property. Carpenter noted increased problems from sewage, trash that was piling up, power cords that posed tripping hazards, damage to lighting, broken Plaza stones, the use of open flames, damaged electrical outlets, and other health and safety issues on the Plaza. According to Carpenter, there were "jugs of human feces in and around the tents, or jugs of human urine in and around the tents," and sewage was being "dump[ed] … into the bushes." (D.I. 69, ex. 8 at 36.) Carpenter's observations led him to say in an e-mail at the time that the demonstrators "have lost control of the situation with the homeless and the environment has become unsanitary and unsafe." (*Id.*, ex. 7 at 9.) Speaking through their attorney-liaison Hunt, the Occupy Nashville participants told Watkins in an e-mail dated October 25, 2011, that they had experienced "some bad problems with being attacked by the homeless or gangs in the middle of the night. One woman [was] assaulted and this weekend one person was sent to the hospital." (*Id.*, ex. 23 at 39.) Lieutenant Donaldson also described receiving complaints regarding indecent exposure, public fornication, and possible drug activity.

### 3. *The State's response: the Use Policy*

At the request of the demonstrators, a meeting was held on October 26, 2011, at which Occupy Nashville representatives – Hunt and a woman named Jane Hussain – discussed with Commissioner Cates, Watkins, Carpenter, Lieutenant Donaldson, and other state personnel the problems arising from the protest on the Plaza. Hunt and Hussain requested that the state provide portable toilets and additional security. Commissioner Cates denied those requests and said that, while the demonstrators would be allowed to return to the Plaza every day, a curfew would be necessary as a matter of health and safety. Commissioner Cates then directed Watkins to draft a new policy that would incorporate a curfew and a permit requirement for use of the Plaza.

Relying in part on the Supreme Court's decision in *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), Watkins determined that the State could impose restrictions on the timing and manner of use of the Plaza. He then drafted a new policy (the "Use Policy"), with assistance from a staff attorney. On October 27, 2011, Watkins met with Commissioner Cates, Commissioner Gibbons, DOS's General Counsel, Tennessee Governor Bill Haslam's Chief of Staff, Governor Haslam's Counsel, and other government officials to consider the duties of the DOS and DGS with respect to the protection of state property and whether the Use Policy would constitute a reasonable restriction on the time, place, and manner of speech in a public forum. Commissioner Cates described the meeting as a conversation about the problems on the Plaza and the proposed policy. The group discussed whether anyone thought the proposed policy was "not a good idea," and no one expressed any concerns with implementing it. (D.I. 72, ex. 7 at 28.)

The Governor's Counsel made some suggestions following Watkins's presentation about the Use Policy, which Watkins incorporated into the document. It is undisputed that no public hearings were held, nor was there a notice and comment period. Although the UAPA provides procedures for implementing rules on an emergency basis, those procedures were not utilized either.

Relevant to this appeal, the Use Policy included a curfew provision which directed that, notwithstanding new permitting requirements, the Plaza would close to the public from 10:00

p.m. until 6:00 a.m. daily.[8]  The same day as the meeting at which the Use Policy was effectively adopted, Carpenter distributed copies of it to people who were on the Plaza, and signs were posted on the Plaza with notice of the curfew.  Additionally, Watkins emailed a copy of the new requirements to Hunt.  Occupy Nashville participants did not seek permission to remain on the Plaza overnight.

### 4. *Arrests under the Use Policy*

At 3:00 a.m. on October 28, 2011, officers of the Tennessee Highway Patrol enforced the Use Policy's curfew.[9]  They surrounded the Plaza and told those present to vacate the Plaza within ten minutes or face arrest.  After ten minutes, they began arresting people, including five of the six Protesters who brought this suit, all of whom were taken to the Davidson County Jail.[10]  The sixth Protester before us was not arrested but left when the officers arrived and gave the ten-minute warning.  The local magistrate on duty that night at the jail refused to sign the arrest warrants, stating that the demonstrators had not been given sufficient notice of the new policy.  The police nevertheless detained the arrestees while they prepared citations for criminal trespass and then released them.  The arrestees then returned to the Plaza to resume their occupation.

The following night, October 29, 2011, shortly after midnight, police officers repeated the process, arresting several demonstrators, and the magistrate again refused to sign the warrants.

## B. Procedural History

On October 31, 2011, the Protesters filed their Complaint in the District Court asserting, among other things, § 1983 claims against Governor Haslam, Commissioner Cates, and Commissioner Gibbons in their official capacities, and against unidentified highway patrol officers in their official and individual capacities, for violating the Protesters' rights under the

---

[8]The Use Policy also provided that, "[e]ffective immediately and until further notice, all assemblies and gatherings of persons on the ... Plaza ... shall require a use permit from the Tennessee Department of General Services." (D.I. 18, ex. 3 at 1.)  The permitting provisions were never enforced and thus are not part of this appeal.

[9]The District Court concluded that the arrests at issue in this case "only related to purported violations of the new curfew requirement." *Occupy Nashville*, 949 F. Supp. 2d at 802.

[10]Plaintiff Shannon asserted that she "was not part of the protest, but was taking photographs on the sidewalk" by the Plaza. (D.I. 18 at 13.)

First, Fourth, Fifth, and Fourteenth Amendments. The Protesters sought equitable relief, including a declaratory judgment, and also sought monetary damages. By agreement of the parties, the District Court issued a Temporary Restraining Order on the same day, which prevented enforcement of the Use Policy. An agreed-upon preliminary injunction was entered by the Court on November 17, 2011. Therefore, as of November 17, 2011 at the latest, the Use Policy was no longer in effect.[11]

The Protesters then filed an Amended Complaint on January 5, 2012, which asserted claims against the same defendants named in the original complaint but also named the State Officials – Commissioners Gibbons and Cates – as defendants in their individual capacities.[12] The Amended Complaint contains nine counts – essentially mirroring those in the initial Complaint – including § 1983 claims for violations of the Protesters' constitutional rights.

The parties filed cross-motions for summary judgment, and the District Court granted in part and denied in part both motions. *Occupy Nashville*, 949 F. Supp. 2d at 782. The Court determined that declaratory and injunctive relief were no longer at issue, as the offending policy was no longer in effect. *Id.* at 790. Furthermore, the Court granted summary judgment in favor of the State Officials on the Protesters' claims alleging violations of the Tennessee Constitution and the UAPA and seeking the return of personal property, because the Protesters had implicitly abandoned those claims. *Id.* at 791.[13] The District Court thus determined that the "only remaining claims at issue … [were] the § 1983 claims asserted against Commissioners Gibbons

---

[11]On April 27, 2012, the DGS withdrew the Use Policy entirely and implemented the rules that are currently in effect. "Although the parties did not file a copy of the Current Rules" with the District Court, the Court took judicial notice of them because they were referenced in the State Officials' submissions. *Occupy Nashville*, 949 F. Supp. 2d. at 784 n.4. The Court determined that the Current Rules were promulgated "pursuant to required agency rulemaking procedures set forth in the UAPA." *Id.* at 784. Those rules provide, in part, that "[c]amping or sleeping overnight on the Plaza or Courtyard is not permitted." Procedures for Use of the Tennessee War Memorial Plaza and Courtyard, Tenn. Comp. R. & Regs. 0690-06-01-.03 (Nov. 20, 2012).

[12]In the amended complaint, the Protesters again named as defendants Governor Haslam in his official capacity and "John Doe" officers of the Tennessee Highway Patrol. The District Court noted that the Protesters were not entitled to relief against Governor Haslam in his individual capacity because they had only sued him in his official capacity and did not seek monetary damages from him. *Occupy Nashville*, 949 F. Supp. 2d at 790. The District Court also noted that the Protesters "never identified th[e] [Highway Patrol] officers and do not dispute that the claims against those officers are no longer viable." *Id.* at 784 n.3.

[13]The Court also noted that the Protesters did not dispute that their Fifth Amendment claim was untenable "because the [State Officials] are not federal officials." *Occupy Nashville*, 949 F. Supp. 2d at 784 n.3. The Court thus dismissed that claim with prejudice –a ruling which the parties do not challenge. *Id.* at 806.

and Cates in their individual capacities, which seek monetary damages for" violation of the Protesters' First, Fourth, and Fourteenth Amendment rights. *Id*. at 791.

As to those remaining claims, the District Court granted summary judgment for the Protesters, holding that the State Officials were not entitled to qualified immunity. *Id*. at 806. Specifically, the District Court granted summary judgment to the Protesters for liability under § 1983 on Count I (violation of First Amendment rights), Count V (violation of the right to be free from a deprivation of liberty without due process), and Count VIII (unlawful arrest).[14] *Id*. at 783-84, 806. The District Court reserved judgment on the issue of damages. *Id*. at 806. This timely appeal followed.

## II.     DISCUSSION[15]

The State Officials argue that the Protesters had no First Amendment right to "occupy" the Plaza indefinitely and therefore, because there was no constitutional violation, qualified immunity applies. The Protesters, in response, argue that the First Amendment right at issue is simply the freedom to air grievances on public property – a right they contend was most assuredly violated by enforcement of the Use Policy, which they describe as a facially invalid regulation of speech and one promulgated in violation of state procedures. The District Court did not define the right in question, and instead provided several different characterizations of it. *Compare Occupy Nashville*, 949 F. Supp. 2d at 797 (asking "[w]hether the Plaintiffs Had a Clearly Established Right to Occupy the Plaza") *with id.* at 798 (characterizing the right as "utiliz[ing] the Plaza for free speech activity"), *and id.* at 798 (stating that "the plaintiffs here were not arrested for 'camping' as such; they were arrested for being *present* on the Plaza

---

[14]The District Court dismissed Plaintiff Malina Shannon from the suit entirely and dismissed with prejudice Plaintiff Katy Savage's claim for unlawful arrest (Count VIII) because she was not arrested. *Occupy Nashville*, 949 F. Supp. 2d at 783, 806. The Protesters have not challenged those portions of the District Court's ruling.

[15]The District Court had jurisdiction under 28 U.S.C. § 1331. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. *See also Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (holding that that denial of qualified immunity is an appealable final decision within the meaning of § 1291). We review a denial of qualified immunity de novo. *Sample v. Bailey*, 409 F.3d 689, 695-96 (6th Cir. 2005). We also review a district court's grant of summary judgment de novo, "using the same standard of review applicable in the district court." *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012). Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* We have pendent appellate jurisdiction to review the grant of summary judgment on liability, to the extent that issue is "inextricably intertwined" with our ruling on qualified immunity. *Brennan v. Twp. of Northville*, 78 F.3d 1152, 1157-58 (6th Cir. 1995).

between the hours of 10 p.m. and 6 a.m., regardless of whether they were among the protestors who had set up sleeping arrangements"), *id.* at 799 (stating that "the plaintiffs had a clearly established right to utilize the Plaza for their free speech activities."), *id.* at 799 (characterizing the right as "overnight free speech activities"). For reasons more fully described herein, we agree with the State Officials that the claimed right must be defined as one of indefinite occupation of a public park, and that, even if the Protesters had a First Amendment right to occupy the Plaza indefinitely, that right certainly was not, and is not, clearly established.

### A. Qualified Immunity

Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (citations and internal quotation marks omitted). While qualified immunity can protect government officials for actions taken in the course of their duties, that protection is forfeited when an official's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 614 (1999) (internal citations omitted) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam) (internal citations and quotation marks omitted).

To determine whether a government official is entitled to qualified immunity, we consider the two-part test described in *Saucier v. Katz*, which asks whether "a constitutional right would have been violated on the facts alleged" and, if so, whether the right was "clearly established." 533 U.S. 194, 200-01 (2001).[16] We are free to address the second question first,

---

[16]We note that, in this Circuit, there is a question of whether the qualified-immunity analysis includes an additional, third step. After reviewing the first two steps, Circuit panels have at times further considered "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *E.g.*, *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009) (internal citations and quotation marks omitted). The Protesters argue that the District Court erred in applying a three-step analysis. Given our conclusion that their rights were not clearly established, we need not reach that question. We note, however, that "[r]egardless of how the test is articulated, a defendant will only be held liable if his or her actions were objectively unreasonable in view of clearly established law." *Robertson v. Lucas*, 753 F.3d 606, 615 n.4 (6th Cir. 2014); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (emphasizing that the "crucial question" is "whether the official acted reasonably in the particular circumstances that he or she faced"); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (emphasizing that "objective legal reasonableness" is the

analyzing whether the constitutional right that purportedly prohibited a defendant's conduct was clearly established, without addressing whether there was a constitutional violation at all. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). To avoid potentially "difficult questions that have no effect on the outcome of the case," *id.* at 236-37, and being mindful of the unusual circumstances under which we preside,[17] we will focus on *Saucier*'s second step – whether the alleged constitutional right was clearly established at the time of the Use Policy's adoption.[18]

### 1. *Clearly Established*

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. [I]n the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "existing precedent must have placed the statutory or constitutional question ... beyond debate." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (internal quotation marks omitted) (quoting *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074, 2083 (2011). "[B]inding precedent from the Supreme Court, the Sixth Circuit, [or] the district court itself" can provide such clarity; persuasive authority from "other circuits that is directly on point" may also demonstrate that a law is clearly established. *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010). Notwithstanding those helpful indicators, "[a] court need not have previously held illegal the conduct in the precise situation at issue because officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Sutton v. Metro. Gov't of Nashville*, 700 F.3d 865, 876 (6th Cir. 2012) (internal quotation marks omitted).

### a. *Accurately defining the claimed right*

The level of generality at which the constitutional right in question is defined is of great importance. *See Anderson*, 483 U.S. at 639 ("The operation of [the qualified immunity] standard

---

"touchstone of *Harlow*").

[17]All of the judges of the Sixth Circuit have recused themselves in this appeal, and this panel of judges from other circuits is therefore sitting by designation.

[18]The District Court described the Use Policy as including two discrete pieces: the "curfew" and the "permit requirement." *Occupy Nashville*, 949 F. Supp. 2d at 788-89. As previously noted, *supra* n. 8, the permit requirement was not applied to the Protesters, so the question of its constitutionality is not before us and we decline to address it, despite the Protesters' desire that we do so.

… depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."). The Supreme Court has "repeatedly told courts … not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff,* 134 S. Ct. at 2023 (omission in original) (citation and internal quotation marks omitted). The State Officials here define the right claimed by the Protesters as a "24-hour occupation" of the public square, which they argue is not a "right" at all. (Appellants' Opening Br. at 23.) The Protesters, by contrast, argue that the constitutional right at issue is not a right to "occupy" the Plaza, but a "clearly established First Amendment right to be present on the Plaza to air their grievances against the government." (Appellees' Br. at 24 n.6.) The more specific and accurate framing of the issue is the one provided by the State Officials.

To support their respective definitions of the claimed right, both Parties rely heavily on *Clark v. Community for Creative Non-Violence*, a case in which the Supreme Court upheld a National Park Service ban on overnight camping on the National Mall, even though the ban restricted a homelessness-awareness protest. 468 U.S. 288 (1984). In *Clark*, the precise issue before the Supreme Court was "whether a National Park Service regulation prohibiting camping in certain parks violate[d] the First Amendment when applied to prohibit demonstrators from sleeping in [two of those parks] ... in connection with a demonstration." 468 U.S. at 289. The Court refused to be drawn into a debate about whether camping or sleeping in a park could be called "expressive conduct." *Id.* at 293. It assumed it could be but then observed that "this assumption only begins the inquiry." *Id.* The Court emphasized the well-established principle that "[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Id.* In a passage key to the case at bar, the Court declared that, "[i]f the Government has a legitimate interest in ensuring that the National Parks are adequately protected, which we think it has, and if the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment as a reasonable regulation of the manner in which a demonstration may be carried out." *Id.* at 297. Importantly, the *Clark* Court also expressed "serious doubt that the First Amendment requires the [government] to permit a demonstration involving a 24-hour vigil and the erection of tents to accommodate 150 people." 486 U.S. at 296.

The State Officials argue that *Clark* supports their definition of the Protesters' claimed right, while the Protesters' contend that *Clark* is inapplicable because, they say, it dealt with camping, rather than mere violations of a curfew provision. (Appellee's Br. at 26-27.) The Protesters may be right that *Clark* does not stand for the proposition that overnight protest activity is entirely unprotected, but that misses the point of the governing precedent on qualified immunity. There must be specificity in the definition of the right at stake. *Plumhoff*, 134 S. Ct. at 2023. Despite their insistence to the contrary, the Protesters' activities were indeed, as their group's name suggests, fundamentally about occupation. They argue, and the District Court agreed, that they were arrested not for camping, but only "for being present on the Plaza between the hours of 10:00 p.m. and 6:00 a.m," *Occupy Nashville*, 949 F. Supp. 2d at 798 (emphasis omitted); (Appellee's Br. at 26). Whether their conduct is called camping or not, however, their late-night presence on the days of their arrest cannot be divorced from the continuous, 24-hour-a-day, seven-day-a-week occupation of the Plaza, of which it was part. The State Officials were confronted with the increasingly chaotic, unsanitary, and dangerous conditions caused by the full-time occupation of the Plaza. The Protesters were arrested as part of a decision to address those serious problems associated with the occupation, not as a result of some vague concern with fleeting protests in the night. To claim, as the Protesters do, that they were merely seeking the right to speak in a public forum is to ignore the actual scope and duration of the protest and thus to express the First Amendment issue in unduly abstract terms. *See Anderson,* 483 U.S. at 639 (cautioning that "[p]laintiffs would be able to convert the rule of qualified immunity … into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights").

### b. *Whether the right to indefinite occupation is clearly established*

The record is undisputed that *Clark* was the primary guide in the drafting of the Use Policy. **[19]** Watkins and a staff attorney studied it and understood that it permitted a curfew for

---

**[19]**The District Court's qualified immunity analysis was premised on its determination that the promulgation of the Use Policy violated state administrative law and, thus, the Old Policy was the only policy in place at the relevant time. The parties dispute whether questions of state administrative law are relevant to a qualified immunity analysis. The State Officials take the position that the District Court improperly "treated th[e] violation of Tennessee law as a violation of the Constitution for purposes of the § 1983 action." (Appellants' Opening Br. at 31.) To the extent the District Court may have considered a violation of state administrative law to amount to a constitutional violation under § 1983, *Occupy Nashville*, 949 F. Supp. 2d at 797, such an analysis was improper. This Circuit has clearly stated that "noncompliance [with state laws and administrative procedures] does

the Plaza. In discussions among the government personnel who gathered to consider the new policy, *Clark* thus undisputedly – and reasonably– provided the background understanding of what could and could not be done by the state to place a temporal limitation on use of the Plaza. It does not matter, then, whether the Protesters have, as they seem to believe, a First Amendment right to move into a public park and take it over for as long as they are doing something that might be called expressive.[20] What matters is that reasonable government officials could, like the State Officials here, understand the law very differently. *See Anderson*, 483 U.S. at 639 (emphasizing that "objective legal reasonableness" is the "touchstone" of qualified immunity analysis). It was neither "plainly incompetent," *Stanton*, 134 S. Ct. at 5, nor was it "beyond debate," *Plumhoff*, 134 S.Ct. at 2023, to read *Clark* as permitting a curfew and to take steps to implement that policy. Then and now, the Supreme Court's analysis can be read that way. The *Clark* Court's "serious[] doubt" about the kind of right claimed here is the antithesis of being "clearly established." The few precedents available are generally contrary to the existence of the "right" at issue. *See, e.g., Lubavitch Chabad House, Inc. v. City of Chicago*, 917 F.2d 341, 347 (7th Cir. 1990) ("Public parks are certainly quintessential public forums where free speech is protected, but the Constitution neither provides, nor has it ever been construed to mandate, that any person or group be allowed to erect structures at will."); *Occupy Columbia v. Haley*, 922 F. Supp. 2d 524, 535 (D.S.C. 2013) ("It is undisputed that the state can restrict camping and sleeping on the State House grounds, and that the state can restrict the time when the State House grounds are open to the public") (citations omitted), *aff'd on other grounds*, 738 F.3d 107 (4th

not state a claim under § 1983," because "[e]ven if implemented in violation of state law, [a] policy [may] satisf[y] the dictates of the First Amendment." *Boswell v. Mayer*, 169 F.3d 384, 390 (6th Cir. 1999).

According to the Protesters, however, "the District Court *had* to determine whether the New [Policy] or Old [Policy] w[as] controlling before the Court could assess the viability of [the] Constitutional claims"; it was, in the Protesters' view, "a necessary, preliminary decision." (Appellees' Br. at 22-23.) Whether that consideration was necessary, or even permissible, in the qualified immunity analysis is a question which, as guests of the Sixth Circuit, we leave for another day, because, even assuming that the District Court properly examined the promulgation of the Use Policy and determined that it was void, we conclude that the right for Occupy Nashville protesters to indefinitely occupy a public park in the manner that they did is not clearly established.

[20]We join the Supreme Court in expressing "serious[] doubt," *Clark*, 468 U.S. at 296, that the First Amendment grants a right to engage in a protest that involves occupying a public space for 24 hours, much less for weeks on end, and that, without question, threatens public health and safety. However, because we sit by designation, we avoid weighing in on the constitutionality of that so-called right or whether, as the District Court determined, the State Officials' violation of state administrative procedures rendered the Use Policy void *ab initio*.

Cir. 2013); *Occupy Fresno v. City of Fresno*, 835 F. Supp. 2d 849, 864 (E.D. Cal. 2011) ("Plaintiffs [Occupy Fresno and members thereof] are not entitled to remain in Courthouse Park for 24 hours a day.").[21]

Nor was it, or is it, clear that the First Amendment gives one an unfettered right to threaten the health and safety of the public or the security of public property. *Cf. Adderly v. Florida*, 385 U.S. 39, 47-48 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."); *Schenck v. United States*, 249 U.S. 47, 52 (1919) ("The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force."). The Protesters admit that the encampment had become so dangerous that they themselves asked the authorities to step in and provide additional protection. *Occupy Nashville*, 949 F. Supp. 2d at 787; *cf.* In any event, the evidence of record demonstrates that the State Officials' conduct was objectively reasonable under the circumstances. *Anderson*, 483 U.S. at 639. In light of the sanitation problems, the violent assaults, the damage to state property, and the generally unsafe and deteriorating conditions, the State Officials were not objectively unreasonable in believing that they could promptly adopt a 10:00 p.m. curfew that would allow them to clean the Plaza and

---

**[21]**The Fourth Circuit reached a somewhat different conclusion, albeit on distinguishable facts. In *Occupy Columbia v. Haley*, the Fourth Circuit affirmed a district court's denial of qualified immunity to state officials at the motion to dismiss stage, stemming from their arrest of Occupy Columbia protesters who were present on State House grounds shortly after 6:00 p.m. 738 F.3d 107, 111-12 (4th Cir. 2013). There, the district court held that there was no clearly established right to camp on, sleep at, or otherwise occupy State House property. *Id.* at 115. The district court went on, however, to read the plaintiffs' complaint as alleging a second, separate violation of a right to be present or protest on State House grounds, which was clearly established. *Id.*

The Fourth Circuit affirmed, holding that the protesters had a clearly established right to be present on the property because there was no valid time, place, or manner restriction in effect. *Id.* at 120-25. Rather, the arrests were pursuant to a letter the Governor issued specifically calling for the arrest of Occupy Columbia protesters present on State House property after 6:00 p.m. *Id. at 123* (quoting the Governor's letter which ordered the removal of "any individual associated with the 'Occupy Columbia' group, as well as his or her belongings, who remains on Statehouse grounds after 6:00 p.m."). Here, although the parties disagree about how to characterize the right in question, we have concluded it is properly described as the right to a continuous occupation of the Plaza. Accordingly, the Fourth Circuit's conclusion that there is a clearly established right to protest or assemble after 6:00 p.m. does not affect our determination. In any event, insofar as the Fourth Circuit's holding would require only an examination of the Protesters' conduct at the precise moment of arrest, without acknowledging the circumstances in which the conduct arose, we decline to follow that decision.

ensure the safety of the public in general and the Protesters in particular.  The State Officials are thus entitled to qualified immunity for their actions.

Our qualified immunity conclusion also necessarily extends to the Protesters' claims that their Fourth and Fourteenth Amendment rights were violated.  Again, the most that can be said for the Protesters' argument is that it is unclear whether they had a right to indefinitely occupy the Plaza for their demonstration.  It is therefore also unclear that the law forbade their arrest and that they had any liberty interest that could be infringed by an alleged failure to provide adequate procedural protections.

## B.  Liability Issues

In addition to contesting the denial of qualified immunity, the State Officials challenge the District Court's partial grant of summary judgment on the issue of liability.  The District Court's ruling left open the issue of damages, which would ordinarily mean that the judgment on liability would be a non-final and unappealable order.  *Woosley v. Avco Corp.*, 944 F.2d 313, 316-17 (6th Cir. 1991).  In this case, though, we can exercise pendent appellate jurisdiction because the liability issues are "inextricably intertwined" with the issue of qualified immunity, over which we clearly do have jurisdiction.  *See Brennan v. Twp. of Northville*, 78 F.3d 1152, 1157-58 (6th Cir. 1996) (applying doctrine of discretionary pendent appellate jurisdiction).  Given that equitable relief is no longer in question, *Occupy Nashville*, 949 F. Supp. 2d at 790, our ruling that the State Officials are entitled to qualified immunity on the remaining claims for damages necessarily resolves the case in its entirety.  *See Brennan*, 78 F.3d at 1158 (noting that qualified immunity is inextricably intertwined with the issue of liability when the two analyses are "coterminous with, or subsumed in" each other) (internal quotation marks omitted); *cf. Williams v. Kentucky*, 24 F.3d 1526, 1541-42 (6th Cir. 1994) (declining to exercise pendent appellate jurisdiction when the issue of liability for injunctive relief remained).  We will therefore reverse the District Court's grant of partial summary judgment on the issue of liability as well.

**III.     CONCLUSION**

For the foregoing reasons, the District Court's order denying qualified immunity and granting partial summary judgment of liability will be reversed and the matter remanded with instructions to enter judgment for the State Officials.