GIBBONS, Circuit Judge,
dissenting.
I.
Although I have concurred in Judge Rogers’s opinion, it is useful here, where there is strong disagreement among members of the court, to provide another alternative path to the same result.
*267 II.
On account of the alleged constitutional violations, the Bible Believers seek declaratory relief, injunctive relief, nominal damages, and attorneys’ fees. As discussed below, however, Bible Believers are not entitled to any of these remedies. Even assuming, arguendo, the majority’s position that a violation of the Bible Believers’ constitutional rights exists, qualified immunity bars the suit against Officers Jaafar and Richardson in their individual capacities. The municipality is also not liable on the remaining damages claims because Bible Believers cannot establish that the allegedly unconstitutional action was the result of a municipal policy. Lastly, dispensing with the remaining claims, the plaintiffs’ prayers for declaratory and injunctive relief are precluded by the absence of a credible threat or imminent injury.
A. Qualified Immunity
Bible Believers’ damages claim against the officers in their individual capacities should fail under qualified immunity because there was, and still remains, no clearly established law pertaining to this specific right.
Qualified immunity affords a broad shield, ensuring “that those who serve the government do so with the decisiveness and the judgment required by the public good.” Filarsky v. Delia, — U.S. -, 132 S.Ct. 1657, 1665, 182 L.Ed.2d 662 (2012) (internal quotation marks omitted). In doing so, it “gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.” Stanton v. Sims, — U.S. -, 134 S.Ct. 3, 5, 187 L.Ed.2d 341 (2013) (per curiam) (emphasis added) (internal citations and quotation marks omitted). The majority’s holding effectively strips the officers of this broad protection, and instead of providing the officers with breathing room, all but suffocates them.
To determine whether a government official is entitled to qualified immunity, we must ask whether “a constitutional right would have been violated on the facts alleged” and, if so, whether the right was “clearly established.” Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The order of analysis is within the courts discretion. Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). In this case, “it is plain that [the] constitutional right is not clearly established,” leaving the constitutional question as an “essentially academic exercise.” See id. at 236-37, 129 S.Ct. 808 (permitting courts to avoid potentially “difficult constitutional questions”). My analysis therefore centers on whether the constitutional right that the defendants purportedly violated was clearly established.[1]
In determining whether a right is clearly established, it is imperative to articulate the right at issue with the appropriate specificity. Saucier, 533 U.S. at 202, 121 S.Ct. 2151 (“The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” (emphasis added)). If the right is characterized at its most general level, the second prong in qualified immunity analysis would serve no purpose. See Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011) (“We have repeatedly told courts ... not *268 to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.” (internal citations omitted)).
The definition, therefore, must be “particularized” in such a way that “[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Anderson, 483 U.S. at 640, 107 S.Ct. 3034 (internal citations omitted). A case directly on point is unnecessary, but “existing precedent must have placed the constitutional question beyond debate.” Sims, 134 S.Ct. at 5 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, -, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011)). To assist in its determination, the court should “look first to the decisions of the Supreme Court, and then to the case law of this circuit.” Gragg v. Ky. Cabinet for Workforce Dev., 289 F.3d 958, 964 (6th Cir.2002).
Here, contrary to the majority’s characterization, the right in question is not the general right to free speech in spite of a crowd’s outrage, but the more specific right of a speaker to be free from an effective removal when his safety and the safety of others have been compromised by an unforeseen violent mob occasioning physical injury on both the speaker and innocent bystanders. A court has yet to find that there is such a right. Thus the determinative question is whether the officers could reasonably have believed— based on pre-existing precedent — that the First Amendment did not preclude them from effectively removing the Bible Believers. See Occupy Nashville v. Haslam, 769 F.3d 434, 445 (6th Cir.2014) (“What matters is that reasonable government officials could, like the State Officials here, understand the law very differently.”) If preexisting precedent would lead “officers of reasonable competence [to] disagree on [the] issue, immunity should be recognized.” Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). There is not one single case predating the conduct at issue that prohibits effectively removing a speaker in a materially similar context. This alone weighs against a finding that the law was clearly established because the officers would not have had “ ‘fair notice that [their] conduct was unlawful.’ ” Lyons v. City of Xenia, 417 F.3d 565, 579 (6th Cir.2005) (quoting Brosseau v. Haugen, 543 U.S. 194, 200, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)).
The majority says that the “heckler’s veto” doctrine — “firmly established]” by the Supreme Court as well as this court in Glasson v. City of Louisville, 518 F.2d 899 (6th Cir.1975) (Op. at 247-48, 258) — clearly established the Bible Believers’ rights. But the Supreme Court’s decisions in this department offer little guidance about today’s case. None of the cases cited by the majority to derive the “heckler’s veto” rule involved government officials acting against a speaker because of actually occurring violence, as opposed to signs of trouble that had not spilled over into violence. See Gregory v. City of Chicago, 394 U.S. 111, 111-12, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); Cox v. Louisiana, 379 U.S. 536, 550, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Edwards v. South Carolina, 372 U.S. 229, 231, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Terminiello v. City of Chicago, 337 U.S. 1, 6, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); Cantwell v. Connecticut, 310 U.S. 296, 309, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The majority sums up these decisions as “affirmfing] the principle that ‘constitutional rights may not be denied simply because of hostility to their assertion or exercise.’” (Op. at 250 (quoting Cox, 379 U.S. at 551, 85 S.Ct. 453).) The *269 principle of course is right, see Snyder v. Phelps, 562 U.S. 443, 458, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011), but it does not tell us what police should do when verbal “hostility,” such as mere “muttering” and “grumbling,” see Cox, 379 U.S. at 543, 85 S.Ct. 453, descends into violence. Later cases say that the government may in some circumstances combat “actual” problems related to speech, especially when public safety is on the line. See, e.g., McCullen v. Coakley, — U.S. -, 134 S.Ct. 2518, 2535, 189 L.Ed.2d 502 (2014); Brown v. Entm’t Merchants Ass’n, — U.S. -, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011); Schenck v. Pro-Choice Network of W. N.Y., 519 U.S. 357, 376, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997).
The Supreme Court’s infrequent invocation of a “heckler’s veto” rationale confirms the lack of guidance that the concept provides. The closest the Court has come to the facts of this case when using the term is in a footnote to a 1966 plurality opinion. See Brown v. Louisiana, 383 U.S. 181, 133 n. 1, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (plurality opinion). Even then, that use of “heckler’s veto” does not help us because the Court invoked the term in the context of potential as opposed to actual violence, reasoning that it would be unfair to suppress peaceful protestors due to the danger that critics “might” react with disorder or violence. Id. On a few other occasions, the Court has used “heckler’s veto” as shorthand for the undesirability of opponents being able to cut off some disfavored speech, idea, or policy, but none of those cases has any bearing here. See, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry, — U.S. -, 135 S.Ct. 2076, 2115, 192 L.Ed.2d 83 (2015) (Roberts, C.J., dissenting); Pleasant Grove City v. Summum, 555 U.S. 460, 468, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). In the last analysis, the Supreme Court had not clearly established that the officers acted unconstitutionally in asking the Bible Believers to leave in the face of ongoing violence, and the “heckler’s veto” does nothing to fill that gap in authority.
Nor did Glasson — the only case that remotely mirrors the circumstances at issue — clearly establish the law that controls this case. There, a police officer tore up the plaintiffs sign because a group across the street, apparently angered by the sign’s message, began screaming at the plaintiff and, as a result, the officer feared for the plaintiffs safety. Glasson, 518 F.2d at 902-03. The Sixth Circuit held that the police officers were liable for a First Amendment violation. Id. at 912. The court found that “[t]he state may not rely on community hostility and threats of violence to justify censorship.” Id. at 906. For “[t]o permit police officers ... to punish for incitement or breach of the peace the peaceful communication of ... messages because other persons are provoked and seek to take violent action against the speaker would subvert the First Amendment.” Id. at 905.
According to the majority, Glasson put the officers on notice that removing the Bible Believers in this circumstance could subject them to liability. (Op. at 258.) In so holding, the majority again ignores the same factual difference — Glasson involved no violence and the case before us involved a violent mob inflicting physical harm on the speakers. In Glasson, the unruliness of the crowd was limited to muttered threats unaccompanied by action; it did not involve actual, physical violence. Id. Here, Bible Believers (and potentially other bystanders) were showered with rocks, plastic bottles, garbage, and milk crates. (DE 1, Complaint, ¶ 46.) The Bible Believers were bruised and bloodied, with one Bible Believer bleeding from his forehead. (Id. at 57). The majority attempts to mitigate the pointed difference between *270 the two scenarios by proclaiming that the violence here was “much less overwhelming.” (Op. at 258.) While the majority’s tolerance for pain is certainly admirable, hundreds of teenaged children throwing a deluge of objects — ranging from bottles to rocks to milk crates — can fairly be characterized as an overwhelming display of aggression and violence.
Glasson can be further distinguished from this case by the officers’ respective responses to the crowds. The officers in Glasson made absolutely no attempt to calm the crowd. Id. at 905. In this case, although the majority faults the officers for not doing enough, neither party disputes that the officers warned, detained, and cited several debris-throwers in an attempt to rein in the chaos.
While the holding in Glasson may clearly establish that an officer must refrain from infringing on the right of a speaker when a crowd becomes angry and threatens violence, it does not clearly establish an officer’s appropriate response to a physically violent and unruly mob of mostly children who are undeterred by police presence.
Moreover, despite Glasson’s ultimate conclusion, the court in Glasson made clear that police officers “may discharge their duty of preserving the peace by ... removing the speaker for his own protection” when a hostile audience would unreasonably subject law enforcement to physical injury. 518 F.2d at 909. Such a pronouncement echoes a recurrent principle: the First Amendment does not afford one an unfettered right to exercise free speech in the face of jeopardizing the safety of members of the public. Police officers are charged with protecting the “ ‘lives, limbs, health, comfort, and quiet of all persons.’ ” Grider v. Abramson, 180 F.3d 739, 752 (6th Cir.1999) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). And the Supreme Court has made plain that when a “clear and present danger” of disorder or other “immediate threat to public safety” appears, “the power of the state to prevent or punish is obvious.” Cantwell v. State of Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). No court has ever recognized a First Amendment right that is so absolute that it can stymie police efforts to cope with highly volatile situations. Markedly, this court has emphasized that police officers must take the actions necessary to protect the physical safety of citizens and the overall public order. See Glider, 180 F.3d at 752.
The majority, seemingly disapproving the ramifications of Glasson, overrules it “to the extent that Glasson’s good-faith defense may be interpreted as altering the substantive duties of a police officer not to effectuate a heckler’s veto.” (Op. at 252.) The majority’s decision to overrule Glas-son ought to tell us all we need to know about the clearly established inquiry. At the time of the incident, it was not sufficiently clear to a reasonable officer that removing the Bible Believers for their own protection violated the First Amendment. Otherwise, there would be no need to overrule this part of Glasson. Implicit — in truth explicit — in the majority’s decision is the recognition that officials could understand the law differently at the time of this incident.[2]
*271 Even after today’s decision, officials could understand the law differently. “Heckler’s veto,” as the many separate writings in this case suggest and as the Supreme Court’s own cases confirm, is more often used as a debater’s point rather than as a doctrinal tool. Even on its own terms, the “rule” does not mean that the government must invariably ignore an opponent’s reaction in deciding how to treat speech. The doctrines of “incitement to imminent lawless action,” Brandenburg v. Ohio, 395 U.S. 444, 449, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam), and “fighting words,” Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), allow censorship based on listener reactions, indeed even potential reactions. The majority seems to suggest that the “heckler’s veto” cases mean that, once a speaker is outside these categories of “unprotected speech” and enters the field of “protected speech,” the listeners’ reactions to speech may never be the basis for government regulation. Surely that is not the law — and at least the Supreme Court has never said it is. “Such a simplistic, all-or-nothing-at-all approach to First Amendment protection is at odds with common sense and with our jurisprudence as well.” R.A.V. v. City of St. Paul, 505 U.S. 377, 384, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).
Apparently recognizing as much, the majority suggests at one point that the police may limit speech in order to protect the speaker from a violent reaction, but only as a last resort. (Op. at 248 (“Punishing, removing, or by other means silencing a speaker due to crowd hostility will seldom, if ever, constitute the least restrictive means available to serve a legitimate government purpose.”).) But at other points, the majority implies this is not the rule at all and that the police may never limit speech in order to protect the speaker, even if doing so is the only way to protect the speaker from serious injury or even death at the hands of an angry mob. (Op. at 252 (“Simply stated, the First Amendment does not permit a heckler’s veto.”); see also Op. at 264 (“The law simply requires the government to refrain from silencing speakers.”) (Boggs, J., concurring).) Given these mixed signals, it is not even obvious what has been clearly established by today’s opinion, much less clearly established what the law was when these officers were forced into action.
A situation where officers could understand the law in different ways, both at the time they acted and after this court acts, is precisely the type of occasion in which police officers should be shielded from personal damages liability. See Malley, 475 U.S. at 341, 106 S.Ct. 1092 (finding that immunity should be recognized in those instances where officers of reasonable competence could disagree on the issue). The fact that reasonable officials can differ in their responses confirms that it was not “plainly incompetent” for the police to believe they had a right to effectively remove the Bible Believers. Stanton, 134 S.Ct. at 5.
B. Municipal Liability
As Monell has informed us, a municipality is only liable for constitutional violations resulting from official policies or customs. The “official policy” requirement “distinguish[es] the acts of the municipality from the acts of employees of the municipality.” Pembaur, 475 U.S. at 479, 106 S.Ct. 1292. An official policy commonly refers to “formal rules or understandings *272 ... that establish fixed plans of action to be followed under similar circumstances.” Id. at 480, 106 S.Ct. 1292. In this regard, the majority admits that Corporations Counsel misstatement of the law in the letter responding to Bible Believers does not amount to an official policy. (Op. 259-60.) Nevertheless, because a single decision by “government authorized decision-makers” can also denote official policy, Pembaur, 475 U.S. at 481, 106 S.Ct. 1292, the majority finds that liability attaches to the municipality through the Corporation Counsel’s instruction advising the Deputy Chiefs to threaten to issue the Bible Believers a citation. (Id.) I must respectfully disagree.
The Bible Believers have presented no evidence from which a reasonable jury could find that Corporations Counsel, or the Deputy Chiefs for that matter, possessed final decision making authority. Unlike in Pembaur, where the Deputy Sheriffs were instructed by their supervisors to follow the orders of the County Prosecutor, 475 U.S. 469, 106 S.Ct. 1292, thus imbuing the Prosecutor with final de-cisionmaking authority, here the evidence is devoid of any such instruction. Instead, the Deputy Chiefs merely conferred with Corporation Counsel because, after all, its duty is to “provide legal services” such as “advising], consulting] or representing]” Wayne County officers. Wayne Cnty. Muni. Code § 4.312. Some advice to an officer, though perhaps ill-conceived, does not metamorphose Corporation Counsel into a decisionmaker with final authority. Indeed, nothing in the municipal code vests Corporation Counsel with “final authority to establish policy.” Pembaur, 475 U.S. at 481, 106 S.Ct. 1292; see also id. at 483, 106 S.Ct. 1292 (“Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possess such authority[.]”). Nor does the evidence show that Corporation Counsel was bestowed with such authority by a final decisionmaker. Advice amounts to nothing more than a. recommendation, not a decision. Therefore, no genuine issues of material fact exist as to whether the violation of the Bible Believers constitutional rights stemmed from Wayne County’s policies or customs.
C. Declaratory and Injunctive Relief
Because qualified immunity only protects officials from damages liability in their individual capacities, Flagner v. Wilkinson, 241 F.3d 475, 483 (6th Cir.2001), and finding no Monell liability only protects the county and officers from damages in their official capacity, the next step is to address whether the Bible Believers are entitled to declaratory and injunctive relief. They are not; the plaintiffs failed to sufficiently allege standing to claim injunctive and declaratory relief. See Kusens v. Pascal Co., Inc., 448 F.3d 349.
That the plaintiffs have standing to pursue their damages claims has no bearing on whether they have standing to request injunctive and declaratory relief. They “must demonstrate standing separately for each form of relief sought.” Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). A prayer for both declaratory and injunctive relief requires an assessment of whether the plaintiff has demonstrated a legitimate likelihood of future harm. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (“[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy ... of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.” (emphasis added)); City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. *273 1660, 75 L.Ed.2d 675 (1983). For the allegation of future harm to be sufficient, there must be a “substantial risk that the harm will occur,” or the threatened injury must be “certainly impending.” Susan B. Anthony List v. Driehaus, — U.S. -, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) (internal quotation marks omitted); see Grendell v. Ohio Supreme Court, 252 F.3d 828, 832 (6th Cir.2001) (“‘[W]hen seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review.’ ”) (quoting Nat’l Rifle Assoc. of Am. v. Magaw, 132 F.3d 272, 279 (6th Cir.1997)).[3]
The Bible Believers’ plans to continue to take an active role in advocating their religious beliefs at a future Arab Festival is insufficient to demonstrate that future harm is likely. Bible Believers fear that “they will again be attacked by Muslims and given the option by [the officers] to either cease their free speech activity or face arrest for disorderly conduct.” (DE 1, Complaint, ¶ 70.) The facts in record belie any contention that they will be exposed to the same or similar circumstances as present here. For the past seventeen years the Arab Festival has gone on virtually without incident — let alone any event remotely similar to the one at issue. This is so despite the annual presence of a multitude of Christian missionaries and evangelists from across the country. (DE 1, Compliant, ¶ 17). Even the Bible Believers concede that during this time “there was little to no conflict between the Christians and the Muslims who attended the Arab Festival.” (Id. ¶24.) In fact, Bible Believers’ attendance at the festival — including the day before the incident in question — was largely uneventful.
Given that the Arab-American Festival is no longer an annual event in Dearborn,[4] there are serious doubts surrounding the very existence of the Festival in the future. Thus, the prospect of a recurring problem is not only “highly conjectural” and indefinite, but also “rest[s] on a string of actions the occurrence of which is merely speculative.” Grendell, 252 F.3d at 833. This speculative injury is not sufficient to bestow the Bible Believers with standing to pursue declaratory and injunctive relief. Thomas v. Campbell, 12 Fed.Appx. 295, 297 (6th Cir.2001) (citing Lewis v. Casey, 518 U.S. 343, 351-52, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)).
III. Conclusion
In conclusion, I must respectfully disagree with my colleagues who believe that *274 we should reverse. Even assuming a violation of the Bible Believers constitutional rights, they are not entitled to any relief: qualified immunity defeats plaintiffs’ individual damages claims against the officers; the absence of a municipal policy responsible for the alleged constitutional violations prevents the plaintiffs from holding Wayne County liable; and finally, the lack of an imminent and credible injury precludes standing for the plaintiffs’ prayers for in-junctive and declaratory relief.

. My analysis would remain the same whether or not a genuine issue of material fact exists as to whether a constitutional violation occurred.

. Indeed, the tenets of Glasson and Cantwell, when viewed in tandem, could lead a reasonable officer to conclude that he may not punish a speaker for peaceful expression merely because the listeners seek to take violent action against the speaker; but, the officer may remove a speaker for his own protection if the audience becomes so violent as to potentially harm — or, as was the case here, actually harm — the speaker, an officer, or a bystander. *271 When viewed through this lens, a reasonable officer, aware of the material distinctions between this case and Glasson, could believe that the escalating violence at the Arab Festival presented an example of when police may remove the speaker for his own protection.

. The inquiry focuses exclusively on prospective conduct. Lyons, 461 U.S. at 103, 103 S.Ct. 1660 ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects.” (internal quotation marks and alterations omitted)). Thus, the fact that Bible Believers were threatened with disorderly conduct at the 2012 Arab Festival is irrelevant to the determination of whether injunctive relief is apposite.

. Cancelling the Arab International Festival Was an Admission of Defeat, Arab American News (Apr. 2, 2015, 9:51 AM), http://www. arabamericannews.com/news/news/id_l 0291/ Canceling-the-Arab-International-Festival-was-an-admission-of-defeat.html; Niraj Warikoo, ACLU Supports Free-Speech Rights of anti-Islam Group, Detroit Free Press (Dec. 26, 2014, 9:37 AM), http://www.freep.com/ story/news/local/michigan/wayne/2014/12/26/ aclu-supports-free-speech-rights-christian-group-hates-islam/20899957/. See Logan v. Denny’s Inc., 259 F.3d 558, 578 n. 9 (6th Cir.2001) (citing Ieradi v. Mylan Labs., Inc., 230 F.3d 594, 598 n. 2 (3d Cir.2000) (noting that it was proper for an appellate court to take judicial notice of newspaper articles even when the articles were not before the district court)).